[Cite as *Aubrey-Dean v. CareSource*, 2024-Ohio-3209.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| LATONIA AUBREY-DEAN | : | |
| Appellant | : | C.A. No. 30078 |
| v. | : | Trial Court Case No. 2023 CV 6436 |
| CARESOURCE | : | (Civil Appeal from Common Pleas Court) |
| Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 23, 2024

. . . . . . . . . . .

MICHAEL W. DeWITT, Attorney for Appellant

ERIN E. RHINEHART & MORGAN K. NAPIER, Attorneys for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Plaintiff-appellant Latonya Aubrey-Dean[1] appeals from a judgment of the Montgomery County Court of Common Pleas, which entered summary judgment against

---

[1] The record is inconsistent as to the spelling of Aubrey-Dean's first name. We use the spelling used on the complaint and appellant's brief.

her on claims of racial discrimination, creating a hostile workplace, and retaliation. For the reasons set forth below, we affirm.

## I.      Facts and Procedural History

{¶ 2} CareSource Management Services, L.L.C. ("CareSource") hired Aubrey-Dean in 2015 and terminated her employment in February 2022. At all relevant times, she worked as a claims analyst in the mass claims adjustments division ("MCA").

{¶ 3} On December 1, 2023, Aubrey-Dean filed a complaint against CareSource alleging racial discrimination, hostile work environment, and retaliation under R.C. Chapter 4112. CareSource filed a motion for summary judgment, and Aubrey-Dean filed a response in opposition. The trial court entered summary judgment on behalf of CareSource. Aubrey-Dean appeals.

## II.      Summary Judgment Standard

{¶ 4} Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there are no genuine issues of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. *Taylor v. Meijer, Inc.*, 2009-Ohio-1966, ¶ 11 (2d Dist.).

{¶ 5} In *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996), the Ohio Supreme Court stated:

[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Id.* at 293.

{¶ 6} We conduct a de novo review when analyzing a trial court's decision to enter summary judgment. *Lafon v. Iron Tiger Logistics*, 2015-Ohio-2428, ¶ 8 (2d Dist.). "De novo review means that this court uses the same standard that the trial court should have used, and we examine all the Civ.R. 56 evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial." *McAlpine v. McCloud*, 2021-Ohio-2430, ¶ 13 (2d Dist.), citing *Ward v. Bond*, 2015-Ohio-4297, ¶ 8 (2d

Dist.).

### III.   Race Discrimination

{¶ 7} Aubrey-Dean's first assignment of error states:

THE COMMON PLEAS COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF CARESOURCE ON MS. AUBREY-DEAN'S RACE DISCRIMINATION CLAIM UNDER R.C. 4112.

{¶ 8} Aubrey-Dean challenges the trial court's decision to render summary judgment on her claims for racial discrimination and creating a hostile work environment.

{¶ 9} Under Ohio law, it is "an unlawful discriminatory practice" "[f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A).   There are two types of race discrimination claims available under R.C. 4112.02.   The first type "requires proof that an employee suffered a specific 'adverse employment action' on the basis of race."   (Citations omitted.) *Grooms v. Supporting Council of Preventative Effort*, 2004-Ohio-2034, ¶ 15 (2d Dist.).   The second type "requires proof that severe and pervasive harassment on the basis of race altered the conditions of employment by creating a 'hostile work environment.' "   *Id.*   Aubrey-Dean

alleges she suffered both types of discrimination.

{¶ 10} We begin with the adverse employment action portion of Aubrey-Dean's claim. "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination or by proving circumstantial evidence that would support an inference of discrimination." *Rice v. Cuyahoga Cty. Dept. of Justice*, 2005-Ohio-5337, ¶ 41 (8th Dist.). Aubrey-Dean does not assert, and we cannot ascertain, any direct evidence of discriminatory intent. She does not claim that any supervisor, manager, or other employee of CareSource made any racist comments or engaged in any other overt racist conduct. Further, she has not presented and does not claim the existence of any documents from which racial animus may be directly discerned or even inferred.

{¶ 11} Absent direct evidence of an employer's discriminatory intent, a plaintiff may establish discriminatory intent using the burden-shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2] *Williams v. Akron*, 2005-Ohio-6268, ¶ 9. The parties in this case do not dispute the application of and have proceeded under the *McDonnell Douglas* analytical framework.

{¶ 12} To create an inference of discriminatory intent under the *McDonnell Douglas* scheme, a plaintiff has the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas* at 802; *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 17 (10th Dist.). This requires an employee to show

---

[2] Ohio courts may apply "federal case law interpreting Title VII of the Civil Rights Act of 1964 . . . to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.,* 66 Ohio St.2d 192, 196 (1981).

that (1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she was terminated, and (4) she was replaced by someone outside the protected class. *James v. Bob Ross Buick, Inc.*, 2006-Ohio-2638, ¶ 32 (2d Dist.), citing *Smith v. Goodwill Indus. of Miami Valley, Inc.*, 130 Ohio App.3d 437, 441-442, (2d Dist. 1998). "Alternatively, the fourth element may be satisfied with evidence that a comparable nonprotected person was treated more favorably." *Id.,* citing *Smith* at 443.

{¶ 13} Aubrey-Dean argues that summary judgment was inappropriate because she had presented evidence sufficient to establish a prima facie case of discrimination. Indeed, the record demonstrates that Aubrey-Dean, as an African American, was a member of a protected class, that she was qualified for her position, and that she was subject to disciplinary actions including termination of her employment. However, Aubrey-Dean does not claim, and there is no evidence to demonstrate, that she was replaced by someone outside her protected class. Thus, she relies upon the argument that other similarly situated individuals who were not members of the protected class were treated more favorably.

{¶ 14} "Where a plaintiff in a discrimination claim contends his or her employer provided more favorable treatment to a non-protected similarly situated person, 'the individual with whom the plaintiff seeks to compare [his or] her treatment must be similar in all relevant respects.' " *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 23 (10th Dist.), quoting *Kenner v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, ¶ 33 (10th Dist.), citing *Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, ¶ 42 (10th Dist.). Employees is "similarly situated" when they "have dealt with the same supervisor,

have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (Citations omitted.) *Chisholm v. Cleveland Clinic Found.*, 2019-Ohio-3369, ¶ 22 (8th Dist.); *Green v CGI Technologies and Solutions*, 911 F.Supp 2d 513 (N.D. Ohio 2012).

{¶ 15} On this record, there was no dispute that CareSource employees, including Aubrey-Dean, were bound by a written management policy that set forth rules for monthly quality and production, attendance, and workplace behavior. The policy set forth a non-exclusive list of actions that could result in termination of employment. Of relevance here, the list included "insubordination, refusal, or failure to perform assigned work, task or refusal to follow reasonable directives from a leader, manager or Company worker," and failure to correct unsatisfactory work performance. Further, there was no dispute that CareSource utilized a progressive discipline scheme consisting of four "steps" which were identified as coaching, written warning, final written warning, and termination.

{¶ 16} The first adverse disciplinary action taken against Aubrey-Dean occurred in January 2021. At that time, Aubrey-Dean's manager, Jamie Jamison, assigned her to train a new employee. The record discloses that, on January 7, 2021, Jamison sent an email to Aubrey-Dean detailing the expectation that she would conduct the training for two to three hours per day for three weeks.[3] The email further specified that, for the following two weeks, the trainee would be given claims to process and Aubrey-Dean would oversee the trainee's work. The email also stated, "we can update/change the

---

[3] It is undisputed that this training merely required Aubrey-Dean to remotely share her computer screen with the trainee and to answer any questions the trainee might have.

plan as needed."

{¶ 17} On January 11, 2021, Aubrey-Dean sent an email to Jamison indicating that she would conduct two-hour training sessions with the new employee on Mondays and Thursdays over a three-week timespan. Later that day, Jamison sent Aubrey-Dean an email reiterating that training was to take place every day and that she should follow the original schedule set forth in the prior email. A few minutes later, Aubrey-Dean responded that the Monday/Thursday schedule was more convenient for her. Later that day, Jamison sent Aubrey-Dean another email in which he stated that he had reviewed her calendar, which showed that she had time to do the required training. He stated that Aubrey-Dean was free to allocate the training time throughout the workday as she wanted, but that she should conduct two to three hours of training per day.

{¶ 18} On January 13, 2021, Jamison learned that the training had not occurred that day or the previous day. He sent an email to Aubrey-Dean outlining the content of his prior emails and asking her whether she would comply with the training schedule as specified in his emails. The next day, Aubrey-Dean replied by email indicating that her proposed schedule worked better with her schedule. She noted that Jamison's prior email had stated that the original training plan could be updated or changed as needed. She then stated that her proposed schedule was "a reasonable amount of training time" which would permit her to meet her other obligations, including breaks and lunchtime. Finally, she stated that she was happy to conduct the training but added that Jamison had the discretion to choose another analyst to do so. A few moments later, Jamison emailed Aubrey-Dean and referred her to his prior email in which he had noted times in

Aubrey-Dean's calendar that would permit the required amount of training. Shortly thereafter, Aubrey-Dean sent an email to Jamison stating:

If you would like for [the trainee] to be trained by another person, that is up to your discretion. I am more than happy to train [her] on the MCA process. By having the training time schedule for Mondays and Thursdays from 10:00 to 12noon, this time will allow a reasonable amount of training time and allow me to prepare for my scheduled weekly meetings and complete other duties assigned to me as well as allow time for breaks and lunchtime. I am also working diligently to make sure that I am meeting the MCA SLA goals. Have a great day.

{¶ 19} Jamison then sent an email asking Aubrey-Dean if she was refusing to train the new employee for two hours daily. Aubrey-Dean replied with an email that was virtually identical to that set forth above. Jamison sent another email asking Aubrey-Dean to answer "yes or no" to whether she would train the new employee for the required two hours per day. Again, Aubrey-Dean responded with the same email. Jamison then sent her another email in which he stated that he would "take [her] answer as a no then." Aubrey-Dean then sent the same email to Jamison for a fourth time. Jamison ultimately referred the trainee to another MCA analyst to complete her training and referred Aubrey-Dean to a CareSource employee relations manager for discipline.

{¶ 20} On February 16, 2021, Aubrey-Dean was notified that she was "being moved into Phase 1 – Coaching for Performance Management" regarding the issues with the training, referring to the first step of the discipline process. Specifically, it was noted

that she had engaged in inappropriate communication with leadership and that she had failed to follow work instructions from leadership. The notice informed her that she would have to undergo coaching in communication.

{¶ 21} In her deposition, Aubrey-Dean admitted that training new employees was a known job requirement. However, in her affidavit in response to CareSource's motion for summary judgment, Aubrey-Dean averred that the training schedule set by Jamison was "not practical." She further stated that she had informed Jamison as to the alterations to the training plan, which she noted were more compatible with her schedule. She stated that she had, in fact, conducted the training and provided all the training necessary for the trainee "to become a successful analyst." Aubrey-Dean averred that Jamison had ignored her concerns about the training schedule and that his emails to her had been "argumentative and demeaning." She further averred that she was inappropriately penalized and required to undergo coaching. Finally, she asserted that she was "not aware of another employee who had been required to attend behavioral classes for addressing a concern."

{¶ 22} The record demonstrates that Aubrey-Dean was initially told to conduct training for a minimum of two hours daily for three weeks, to be followed by two weeks of observing the trainee's work. While the original email from Jamison did state that the schedule could be updated or changed as needed, it did not permit Aubrey-Dean to make a unilateral change to the amount of training time.[4] However, Aubrey-Dean informed

---

[4] For example, Jamison's later email indicated that Aubrey-Dean could schedule the training for different times during the day if needed, rather than conducting it all in one continuous timespan. However, all of Jamison's emails informed Aubrey-Dean that she was required to conduct a minimum of two hours training per day for three weeks.

Jamison that she intended to conduct significantly less training. Further, although Aubrey-Dean claimed she had properly trained the new employee, the record demonstrates that Jamison had to assign a second MCA team member to complete the employee's training.

{¶ 23} Most importantly, the record is devoid of any evidence that any other employee to whom Aubrey-Dean compared herself was alleged to have engaged in the same conduct. Aubrey-Dean presented no evidence that any other member of the MCA team had ever refused to conduct a certain amount of training for new employees. Further, she has not claimed or provided any evidence that the amount of training time required by Jamison was more than that normally prescribed for training new employees of the MCA team. Finally, although she claims that she was "not aware" of any other MCA team members being subjected to coaching as a disciplinary action, the record clearly demonstrates that other team members had been subject to the step one discipline of coaching as their first disciplinary action for infractions of company policies. In short, Aubrey-Dean failed to even allege, let alone establish a genuine issue, that a similarly-situated non-protected individual engaged in the same conduct and received more favorable treatment.

{¶ 24} The next disciplinary action occurred after Aubrey-Dean failed to timely complete mandatory compliance training. Specifically, on July 12, 2021, CareSource management sent an email to all employees regarding mandatory compliance training. The email stated that the training, which consisted of online sessions, was to be completed by October 2021. However, that same day, management for the MCA team

sent an email requiring MCA team members to complete the training by July 31, 2021. The MCA team was sent three email reminders about the training and completion date and was given reminders twice a week during team meetings. Finally, the team was given a reminder by instant messaging on July 30, 2021.

{¶ 25} Aubrey-Dean attached the transcript of her training to her response to the motion for summary judgment. The transcript showed that the training consisted of approximately two hours of online sessions, that Aubrey-Dean began two of the training sessions on July 12, 2021, that she began the remaining sessions on July 30, 2021, and that she did not complete the training until August 3, 2021. On August 5, 2021, CareSource issued a written warning disciplinary notice to Aubrey-Dean, citing her failure to timely complete the training.

{¶ 26} In her affidavit, Aubrey-Dean stated that she normally takes a one-week vacation in July and that, when she returned to work, she had a large backlog of work to complete. She also averred that in past years, she and other MCA team members had been "permitted to simply complete the training after the deadline." She did not deny that she did not complete the training by July 31.

{¶ 27} Aubrey-Dean did not present any evidence that any similarly-situated non-protected MCA team members were permitted to complete the training after the July 31 completion date or that any other employees who failed to meet the deadline were treated more favorably. Indeed, the record shows that seven MCA team members did not timely complete the training. Of those seven, four were given step one coaching as their disciplinary action, and the other three, Aubrey-Dean and two white employees, were

giving written warnings because they were further along in the disciplinary step process. Based on this evidence, Aubrey-Dean failed to make a prima facie case of discrimination by disparate treatment.

{¶ 28} On September 2, 2021, Jamison met with Aubrey-Dean to discuss performance issues. Aubrey-Dean was informed of the need to timely respond to emails and questions from leadership and that she was required to follow directions from leadership. The following day, Ryan Shafer, the Senior Director of the Claims Department at CareSource, and Aubrey-Dean had a director approval meeting during which Shafer requested information regarding the "lag time" to get an assignment to committee for approval. According to Shafer's affidavit, Aubrey-Dean did not respond to his request. Then, on September 9, Shafer directed a question about a specific assignment to Aubrey-Dean. Even though the assignment was an MCA research issue, Aubrey-Dean directed the issue to a different department for completion. On September 14, 2021, CareSource issued a final written warning to Aubrey-Dean for unsatisfactory performance regarding her failure to respond to Shafer and directing MCA work to an outside team.

{¶ 29} In her affidavit in opposition to summary judgment, Aubrey-Dean averred that the warning had been issued even though she had addressed all of the "purported issues" raised by management regarding her conduct and despite "the fact that [her] performance during [her] time at CareSource was amongst the highest quality of anyone in [her] position." Notably, Aubrey-Dean provided no evidence to rebut the evidence presented by CareSource that the performance issues referenced in the final written

warning had occurred. She also did not offer evidence that any of her peers had had the same or similar performance issues or that, if they had, they were treated more favorably. Thus, Aubrey-Dean failed to present a prima facie case of discrimination as to the final written warning.

{¶ 30} The final disciplinary action, termination of employment, occurred in February 2022 and involved the processing of three "tickets." The record demonstrates that a ticket is a claims assignment given to a member of the MCA division for review to determine why the claims were denied or whether they were paid properly. Because each ticket involved a large numbers of claims, CareSource's written policy provided for disciplinary action if an MCA member had more than one inaccurate ticket per month.

{¶ 31} CareSource presented evidence that Aubrey-Dean processed two zero-pay "tickets," consisting of over 25,000 claims, without approval. The record shows that CareSource's policy provides that zero-pay tickets are rarely processed by MCA team members, and then only with prior approval from management. That same month, Aubrey-Dean failed to conduct a required test to ensure the accuracy of a third ticket, which resulted in numerous claims being denied as out of network when they should have been processed as in network. Because Aubrey-Dean processed three inaccurate tickets during a one-month timeframe, she was subject to the final disciplinary step of termination.

{¶ 32} Aubrey-Dean offered no evidence to rebut CareSource's evidence that she had processed three inaccurate tickets during a one-month period, and she does not claim that she was unaware of CareSource's policies regarding the processing of tickets

and the penalty for incorrect processing. Furthermore, the unrebutted evidence in the record shows that other members of the MCA team were given various levels of discipline, with each employee's specific discipline matched to that employee's position in the progressive disciplinary scheme, when they exceeded one inaccurate ticket processing in a month, including a white employee who was terminated for ticket inaccuracy.

{¶ 33} Based on our review of the record, Aubrey-Dean failed to present any competent evidence to meet her burden under Civ.R. 56 to demonstrate there was a genuine issue of material fact related to her discrimination claim for disparate treatment. Thus, the trial court properly entered summary judgment against her for failure to establish a prima facie case of racial discrimination.

{¶ 34} Aubrey-Dean next argues that the trial court erred in rendering summary judgment in favor of CareSource because the evidence demonstrated that her co-workers and supervisors created a hostile work environment.

{¶ 35} To prevail on a claim for hostile work environment created by racial harassment, a plaintiff must demonstrate: (1) the employee is a member of a protected class, (2) the employee was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment, and (5) employer liability through respondeat superior. *Bell v. Cuyahoga Community College,* 129 Ohio App.3d 461, 466-467 (8th Dist. 1998); *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 33 (10th Dist.).

{¶ 36} Aubrey-Dean lists a number of events that she claims created a hostile work

environment.   The first, which occurred in April 2020, involved a manager's request that Aubrey-Dean and another co-worker to prepare and present an MCA team training.   The manager later communicated that the manager and the co-worker had spoken and the co-worker had stated that she was "going to put something together and present to the team."   The manager indicated that the co-worker was going to "send a presentation over once she has something pulled together."   The manager further indicated that Aubrey-Dean could add to the presentation if she so desired.   According to Aubrey-Dean, the co-worker "excluded her from collaboration efforts and did not allow [her] to add any input on the MCA PowerPoint Presentation."

{¶ 37} Aubrey-Dean next complains that, in May 2020, Shafer sent her emails that were "condescending," "antagonizing," "ridiculing," and "demeaning."   The series of emails between Shafer and Aubrey-Dean appeared to involve a ticket that was processed incorrectly.   After Shafer inquired about the ticket, Aubrey-Dean sent him an email in which she stated that the issue was not the fault of the MCA team.   Shafer then sent her a reply email in which he stated, "Latonya, you are missing the point.   This team is absolutely responsible for the claims that run through MCA and ensuring they pay correctly."

{¶ 38} Aubrey-Dean also claims that Jamison "threatened her with jail time" and legal action after she forwarded company emails to her personal email.   There is no documentary evidence in the record regarding the emails.   However, Aubrey-Dean averred in her affidavit that she transferred the emails to her personal account "simply to keep a record of my complaints and supporting documentations regarding those

complaints."

{¶ 39} Aubrey-Dean also complains that she was omitted from email lists and excluded from certain meetings, that Jamison was "aggressive and unreasonable" regarding the above-referenced training of the new employee, and that Shafer and Jamison "continued to harass [her] and continuously criticized [her] analysis for [her] work assignments."

{¶ 40} We will begin our analysis with the third prong of the test, that the harassment must be based upon race. Other than her broad and conclusory averments in her affidavit that she was subjected to racial discrimination, Aubrey-Dean presented no evidence to support this claim. She did not claim that any of her co-workers or superiors uttered racial slurs or otherwise directly behaved in a racially derogatory manner. There was no evidence that she was subjected to overt racial comments or behavior. There was no evidence that she overheard anyone making racial comments. The only evidence regarding a hostile work environment consisted of her averments that she had conflicts with a co-worker and members of management. However, there was simply no evidence that any of these conflicts were based on race. "R.C. 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification." *Rice*, 2005-Ohio-5337, at ¶ 36, quoting *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 176-77 (2000).

{¶ 41} We next address the fourth requirement. In order to determine whether a

work environment was sufficiently hostile to satisfy the fourth prong of this test, the court looks at all of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Faragher v. Boca Raton*, 524 U.S. 775, 787-788 (1998); *Harmon v. GZK*, 2002-Ohio-545, * 6 (2d Dist.).

{¶ 42} Aubrey-Dean did not offer any evidence that any of the claimed conduct unreasonably interfered with her work performance. She did not claim that she had been contemplating separating from her employment or that she had been discouraged from remaining on the job. She did not claim she had been denied advances in her career, and she did not claim that the conduct impaired or detracted from her work performance. Indeed, she averred that her "performance during [her] time at CareSource was amongst the highest quality of anyone in [her] position."

{¶ 43} Based upon the record before us, we cannot say that the trial court erred in granting summary judgment on Aubrey-Dean's claim that her employer created a hostile work environment.

{¶ 44} The first assignment of error is overruled.

## IV.    Retaliation

{¶ 45} Aubrey-Dean's second assignment of error asserts:

THE COMMON PLEAS COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF

CARESOURCE ON MS. AUBREY-DEAN'S RETALIATION CLAIM UNDER R.C. 4112.

**{¶ 46}** Aubrey-Dean contends that she presented evidence that created genuine issues of fact regarding her claim for retaliation. Thus, she argues that the trial court erred by entering summary judgment against her on this claim.

**{¶ 47}** The Ohio Civil Rights Act "forbid[s] retaliation by employers against employees who report workplace discrimination." *Meyers v. Goodrich Corp.*, 2011-Ohio-3261, ¶ 10 (8th Dist.). Specifically, R.C. 4112.02(I) states that "it is an unlawful business practice to discriminate against a person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

**{¶ 48}** "A plaintiff may prove a retaliation claim through either direct or circumstantial evidence." *Diller v. Miami Valley Hosp.*, 2017-Ohio-9051, ¶ 46 (2d Dist.), citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008), and *Nebozuk v. Abercrombie & Fitch Co.*, 2014-Ohio-1600, ¶ 39 (10th Dist.). Again, Aubrey-Dean did not set forth any direct evidence of retaliation. Thus, she may "establish retaliation through circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas*." *Id.* Under this framework, Aubrey-Dean "bears the initial burden of establishing a prima facie case of retaliation." *Id.* To establish a prima facie case of retaliation under R.C. 4112.02(I), an employee must establish the following: (1) she engaged in a protected activity; (2) her employer was aware of her participation in

protected activity; (3) she suffered an adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 13.

{¶ 49} The record shows that in August 2020, Aubrey-Dean filed a complaint with CareSource's human resources department alleging that she was being subjected to racial discrimination. That same month, Aubrey-Dean made a complaint to human resources claiming that she had been subjected to retaliation following her first complaint. The two complaints were investigated but no finding of discrimination or retaliation was made. As outlined above, Aubrey-Dean was subjected to her first disciplinary action in February 2021. In March 2021, she filed a complaint with the EEOC alleging racial discrimination, hostile work environment, and retaliation.[5] The second and third disciplinary actions took place in August and September 2021, respectively. The final disciplinary action, termination of employment, occurred in February 2022.

{¶ 50} Thus, the record demonstrates that Aubrey-Dean engaged in a protected activity of lodging complaints about discrimination and that CareSource was aware of the protected activity, and there is no question that Aubrey-Dean suffered adverse employment actions following the protected activity. The only remaining question in this case is whether there was a genuine issue of material fact that a causal link existed between the protected activity and the adverse action.

{¶ 51} To demonstrate a causal connection between an adverse employment action and the exercise of protected rights, the evidence must show that the employee's

---

[5] The record shows that the EEOC complaints were dismissed upon a finding of no reasonable cause to conclude that CareSource discriminated against Aubrey-Dean.

engagement in protected activity was a determinative factor, rather than just a motivating factor, in the employer's decision to take an adverse employment action. *Diller,* 2017-Ohio-9051, at ¶ 46; *Little York Tavern v. Lane,* 2017-Ohio-850, ¶ 16 (2d Dist.). Thus, "a plaintiff must produce evidence which permits the inference that apart from the protected activity, the adverse action would not have been taken." *Nguyen v. Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000). This determination is made with reference to the surrounding circumstances, including "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights[.]" *Id.*

{¶ 52} Aubrey-Dean first argues that the "timeline [of protected activity followed by disciplinary action] is evidence that the adverse action was in retaliation for the protected activity." She next argues that her affidavit and "other exhibits" attached to her response to the motion for summary judgment provided sufficient evidence to survive summary judgment.

{¶ 53} Generally, "the mere fact that an adverse employment action occurs subsequent to the protected activity does not alone support an inference of retaliation." *Pflanz v. Cincinnati,* 2002-Ohio-5492, ¶ 64 (1st Dist.), citing *Cooper v. N. Olmsted.* 795 F.2d 1265, 1272 (6th Cir. 1986); *accord Nguyen v. Cleveland,* 229 F.3d 559, 566 (6th Cir. 2000) ("temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence"). Indeed, for temporal proximity alone to support a finding of retaliation, courts have stated that the adverse employment action must occur "very close in time after an employer learns of the protected activity." This

court has found that a time lapse of three months between the protected activity and the adverse employment action is too long a period of time to permit temporal proximity alone to be sufficient evidence of retaliation. *Hammonds v. Beavercreek City Schools*, 2021-Ohio-4022, ¶ 25 (2d Dist.); *accord Woods v. Capital Univ.*, 2009-Ohio-5672, ¶ 50 (10th Dist.) (where approximately two months had elapsed between the employer's learning that the employee had engaged in a protected activity and the adverse action, the temporal proximity was not so close that the employee could rely upon timing alone to establish a causal connection).

{¶ 54} Here, there was a lapse of over five months between Aubrey-Dean's complaints to human resources and the issuance of her first disciplinary action. She then filed her EEOC complaint. Her second disciplinary action occurred five months thereafter. Importantly, CareSource did not terminate Aubrey-Dean's employment for more than a year after the filing of the EEOC complaint. Thus, we conclude that Aubrey-Dean could rely solely on her claim of temporal proximity to prove retaliation.

{¶ 55} A review of the record shows Aubrey-Dean did not present any other competent evidence to support a claim of retaliation. She did not present any evidence to show that the stated reasons for the disciplinary actions had no basis in fact or were false. Although she claimed she adequately trained the new employee, she did not deny that she did not comply with Jamison's direction that she conduct two hours of training per day. She further did not dispute that she had failed to complete her compliance training by the deadline set by the MCA management team. Aubrey-Dean claimed that she addressed the issues related to the third disciplinary action, but she did not deny that

she had engaged in the actions giving rise to that discipline. Finally, she did not deny that she had exceeded the allowance for incorrect ticket processing.

{¶ 56} Further, the only averments set forth in her affidavit regarding retaliation stated: "I believed at the time, and still believe" that the adverse employment actions constituted retaliation. Affidavits are among the evidentiary materials that may be used to support or contest a motion for summary judgment. But to qualify as an affidavit, certain requirements must be met. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Civ.R. 56(E). Aubrey-Dean's statement that she believes there was a relationship between the protected activity and the disciplinary action did not constitute personal knowledge. Instead, her averment was merely a speculative, conclusory assertion unsupported by the record and was insufficient to create a genuine issue of material fact for trial.

{¶ 57} The temporal proximity was not so close that Aubrey-Dean could rely upon timing alone to establish a causal connection. Further, she did not point to any other evidence that would allow a reasonable finder of fact to infer that engaging in the alleged protected activity caused the adverse action. Consequently, she failed to create a genuine issue of material fact as to the fourth element of the prima facie case of retaliation.

{¶ 58} Accordingly, the second assignment of error is overruled.

## V.      Conclusion

**{¶ 59}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.